# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| JESSICA L. FONTENOT | * | CIVIL ACTION NO. 11-0909 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

### REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Jessica L. Fontenot, born July 29, 1966, filed an application for supplemental security income on June 20, 2007, alleging disability as of December 31, 1992, due to high blood pressure and idiopathic neuropathy.

### FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of Fed. R. Civ. P. 52, I find that this case should be remanded for further proceedings, based on the following:

**(1) Report from Dr. George Williams dated May 15, 2006**.  Claimant complained of leg pain and cramping.  (Tr. 110).  She reported that the pain went down her legs, and that she got a cramping sensation into the calves and toes, and that her toes would curl.  She had a history of hypertension.

On examination, claimant had no pain over the lumbar, cervical, or thoracic spine.  She had good range of motion of the lumbar spine.  Neurologically, she had 4/5 in extensor hallucis longus and the plantar flexors on either foot, normal sensory exam, negative straight-leg raise, down-going toes, and 1+ reflexes.  (Tr. 111).

An MRI showed a contained herniated disc at L4-5, which was effacing to the left side and effacing more of the left L5 nerve root as opposed to the right.  The report showed that she had something at L5-S1, but Dr. Williams was "not appreciating it."

Dr. Williams' diagnosis was herniated nucleus pulposus with mild spinal stenosis at L4-L5.  He recommended an EMG/nerve condition study to differentiate between peripheral neuropathy and a radiculopathy.

**(2) Records from Dr. Kevin Hargrave dated June 7, 2006**.  Dr. Hargrave conducted EMC nerve conduction studies of claimant's lower extremities secondary to complaints of foot numbness, foot and leg pain, and leg numbness.

(Tr. 114).  Neurological exam showed an absent right ankle jerk, but normal motor testing.  She had absent vibration perception in the right great toe, but it was present at the right ankle.  She was moderately obese.

On EMG, Dr. Hargrave saw no overt radiculopathy.  His impression was polyneuropathy, etiology unknown.  He noted that claimant's co-morbid lumbar spine disease by report was an additional confounder, since she did have some foraminal components.  However, based on her clinical history and exam, he believed that this was not a lumbar spine process and "almost certainly a neuropathy process."  He recommended anti-seizure drugs.

**(3) Records from Fleur de Lis Community Health Clinic dated March 14, 2006 to June 15, 2007**.  On March 14, 2006, claimant presented with bilateral lower extremity neuropathy and edema.  (Tr. 127).  A bilateral lower extremity venous ultrasound showed no evidence of deep venous thrombosis.  (Tr. 127).  An arterial duplex ultrasound was normal.

On April 27, 2006, claimant complained of right ankle pain, "squeezing" pain in the thighs and calves, burning pain to the feet with numbness, and extreme right leg pain with walking.  (Tr. 125).  Her blood pressure was 142/98.  On examination, she had decreased sensation in the distal lower extremities bilaterally to temperature/touch, abnormal motor strength in the right leg and dorsi-plantar,

3

abnormal reflex in the right Achilles, and pain in the middle right buttock down both legs with severe neuropathy, especially to the feet.  The assessment was leg pain r/o spondylolisthesis.  (Tr. 126).  She was prescribed Depo-Medrol, Toradol, and Panlor SS.

An MRI taken May 1, 2006, showed a slight broad-based posterior disc bulge of L5-S1 with material extending around towards the medial foramina bilaterally; a mild to moderate broad-based bulge of L4-L5 posteriorly in the midline and to the left of midline extending into the medial aspect of the left-sided L4-L5 foramen, and a lesser amount of bulging disc material extending towards the right-sided foramen at L4-L5; dessication of the L4-L5 disc, slight narrowing of the L4-L5 and L5-S1 neural foramina bilaterally, and some slight spinal stenosis at the L4-L5 disc space level and slight spinal stenosis of the dorsal bony spinal canal at the L3-L4 disc space level.  (Tr. 123-24).

October 24, 2006, claimant had decreased sensation to the lower extremities, pain and tightness to the feet, callous to her heels and great toes, and normal vibrator sense on examination.  (Tr. 120).  The assessment was idiopathic neuropathy, hypertension, and panic disorder.  (Tr. 121).  Valium was added to her medications.

4

On June 15, 2007, claimant presented with hypertension, neuropathy, and depression. (Tr. 118). She had pain/numbness/tingling in the lower extremities bilaterally. She was hyper-reflexic in the lower extremities with ataxic balance. Motor strength in the lower extremities was weak, and sensation was diminished.

Claimant reported that she was depressed at times, but was better overall. (Tr. 119). The assessment was hypertension, idiopathic neuropathy, anxiety, and depression.

**(4) Consultative Examination by Dr. Wilfred J. Briley dated August 8, 2007**. Claimant complained of pain, numbness, and tingling in the lower extremities and high blood pressure. (Tr. 128). She reported that her legs sometimes completely gave out, and she fell to the ground. Her medications included Gabapentin, Naproxen, Diazepam, Hydrocodone, Metoprolol, Norvasc, Benazepril, and HCTZ.

On examination, claimant's blood pressure was 130/88, 136/90. (Tr. 129). Her height was 68 inches tall, and weight was 236 pounds. Knee and ankle jerks could not be elicited.

Claimant's range of motion was good in all directions. She had problems doing toe-heel walk. Her blood sugar was 234.

Dr. Briley noted that claimant was told that her problem was idiopathic neuropathy.  However, he found that she had a 211 blood sugar, and advised that she see her family doctor.  He opined that her leg problem could possibly be diabetic neuropathy.  He stated that she was overweight at 68 inches tall and 236 pounds, and that her blood pressure was high.

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Briley found that claimant could lift/carry less than 10 pounds occasionally for 1/3 of an 8-hour day.  (Tr. 130).  He determined that she could stand/walk less than two hours total, and less than two hours without interruption.  She could sit for less than six hours, and less than six hours without interruption.  Her ability to climb, kneel, balance, crouch, and crawl was affected by her impairment, but stooping was not.  She was restricted as to heights and temperature extremes.  (Tr. 131).

**(5) Physical Residual Functional Capacity ("RFC") Assessment dated August 31, 2007**.  The examiner determined that claimant could lift/carry 10 pounds occasionally and less than 10 pounds frequently.  (Tr. 133).  She could stand/walk at least two hours in an eight-hour workday.  She could sit about six hours in an eight-hour workday.  She was limited as to pushing/pulling in the lower extremities.

6

Claimant could occasionally climb ramps/stairs stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds, and frequently balance. (Tr. 134). She had no other restrictions. (Tr. 135-36).

**(6) Records from Angela Neely, FNP dated March 14, 2006 to February 21, 2009**. Ms. Neely determined that claimant could frequently twist, occasionally stoop, rarely crouch/squat and climb stairs, and never climb ladders. (Tr. 142). She found that claimant did not have significant limitations with reaching, handling, or fingering. She stated that claimant's impairments were likely to produce good and bad days, and that she was likely to absent from work more than four days per month because of her impairments. She reported that the earliest date that these symptoms and limitation applied was March 14, 2006.

Additionally, the nurse practitioner stated that claimant could sit and stand/walk for 15 minutes at one, and less than two hours in an 8-hour working day. (Tr. 143). She found that claimant had to walk around every 30 minutes for five minutes each time. She determined that claimant needed a job that permitted shifting positions at will from sitting, standing, or walking.

Ms. Neely also found that claimant would need to take unscheduled breaks every one to two hours for 20 to 30 minutes at a time. She determined that claimant should elevate her legs at 90 degrees for 50 to 60% of the workday. She

stated that claimant should use a cane or other assistive device while engaging in occasional standing/walking.

Additionally, the FNP found that claimant could lift up to 10 pounds occasionally.  Positive objective signs included an ataxic gait with frequent falling, abnormal gait, sensory loss, reflex changes, muscle spasm, muscle weakness, impaired sleep, and bilateral lower extremity paresthesia.  (Tr. 144).

Regarding claimant's lumbar spine, Ms. Neely reported that she had DDD, spinal stenosis, lumbar neural foraminal narrowing, and mild disc bulging.  (Tr. 145).  These findings were supported by low back pain, inability to sit for long periods, bilateral lower extremity paresthesia, and falling.  Her prognosis was fair.

Ms. Neely opined that emotional factors contributed to the severity of claimant's symptoms and functional limitations.  (Tr. 147).  Her symptoms were severe enough to frequently interfere with attention and concentration.  The NP noted that claimant had panic disorder which was associated with increased pain, leg symptoms, and falling.  (Tr. 149).

Claimant was treated with Metoprolol to decrease tachycardia from panic attacks, and Buspar and Diazepam as anti-anxiolytics.  Side effects of her medications included dizziness, drowsiness, and upset stomach.  (Tr. 144, 147).

Ms. Neely opined that claimant's impairments lasted or could be expected to last at least 12 months.

Claimant's diagnoses were Type 2 diabetes mellitus, hypertension, diabetic neuropathy, panic disorder, and ataxia. (Tr. 150). Her prognosis was stable, but no improvement in neuropathy was expected. Her diabetes was well-controlled, with no improvement in neuropathy and leg function.

Claimant's anxiety was accompanied by autonomic hyperactivity, apprehensive expectation, and recurrent severe panic attacks on average of once a week. (Tr. 154). Her symptoms included sleep disturbance, shortness of breath, and tachycardia.

Claimant was capable of low stress jobs. (Tr. 151). She was to avoid concentrated exposure to extreme cold and heat. (Tr. 153).

**(7) Claimant's Administrative Hearing Testimony**.[1]  At the hearing on October 27, 2008, claimant was 42 years old. (Tr. 26). She had attended school through the 11th grade. She testified that she had worked at a nursing home as a CNA, and at a sewing factory. (Tr. 27).

---

[1]Claimant was unrepresented at the hearing. She waived her right to representation on the record and by written waiver. (Tr. 25, 64). This is not one of the grounds for appeal.

Regarding complaints, claimant testified that she had numbness in her legs and feet.  (Tr. 28).  She stated that she had hypertension and high blood pressure. She reported that her legs and feet became numb and hurt if she sat or stood too long.  (Tr. 28, 33).   She also said that he had headaches, depression, and trouble concentrating and sleeping.  (Tr. 30, 34).

Additionally, claimant complained of panic attacks, where her heart started racing, she felt smothered, and became "real claustrophobic" and overwhelmed. (Tr. 28-29).  She reported that she was taking Buspirone for panic attacks, which she had a couple of times a day.  (Tr. 30). She testified that the medication helped, but that her diabetes medicine caused diarrhea.  (Tr. 34-35).

As to activities, claimant testified that she cooked every two or three days, did laundry and dishes, dusted, and mopped.  (Tr. 31).  She stated that she grocery shopped, but could not lift anything heavy.  (Tr. 32).  She reported that she visited her aunt at the nursing home and her mother-in-law occasionally.  She also said that she went to church, watched television, drove, and worked on crossword puzzles.  (Tr. 32, 34).

Regarding restrictions, claimant testified that she could walk about one block before having to stop.  (Tr. 35).  She stated that she could stand for about five minutes in one place before having to walk around.  She said that she could sit

for 10 to 15 minutes before having to alternate.  (Tr. 36).  She stated that her arms became numb if she sat for a long time.

Claimant testified that she had no problems getting along with people.  She had no problems following instructions.  She said that she became light-headed around dust and heat.

**(8) Administrative Hearing Testimony of Harris N. Rowzie, Vocational Expert ("VE")**.  Mr. Rowzie confirmed that claimant had no past relevant work. (Tr. 38).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age and education; who was limited to sedentary work, which meant sitting up to six hours a day, and standing and walking up to two hours a day, and had to alternate sitting, standing, and walking.  In response, Mr. Rowzie identified the jobs of telephone quotation clerk, of which there were 91,000 jobs nationally and 1,300 statewide, and surveillance system monitor, of which there were 26,000 jobs nationally and 250 statewide.  (Tr. 38-39).

When the ALJ changed the hypothetical to assume a claimant who was limited to sedentary work, had to alternate sitting, standing, and walking, and had further limitations on climbing, kneeling, balancing, crouching, crawling, working at heights and at temperature extremes, Mr. Rowzie testified that those jobs would not change much.  (Tr. 39).

11

**(9) The ALJ's findings**.  Claimant argues that: (1) the ALJ erred in failing to find that she was disabled and entitled to benefits; (2) alternatively, the ALJ erred in failing to find that she was disabled for a time and entitled to a closed period of disability benefits; (3) the ALJ erred in finding that claimant's testimony and complaints were either not credible or only partially credible; (4) the ALJ erred in failing to give proper weight to the opinions of her treating physicians, and (5) the Appeals Council erred in finding that there existed substantial evidence to support the decision of the ALJ.  Because I find that the Commissioner failed to fully develop the record concerning claimant's mental impairment and diabetic neuropathy, I recommend that this matter be **REMANDED** for further proceedings.

In finding that claimant's mental impairment of panic attacks was not severe, the ALJ noted that she had sought no treatment from specialists in a mental health facility.  (Tr. 16).   She further observed that claimant suffered from anxiety and depression for which she was prescribed Buspar "with overall improvement." However, the latest medical records do not support the ALJ's finding.

The evidence shows that claimant was diagnosed with panic attacks as far back as March 22, 2006.  (Tr. 192).  On June 15, 2007, she still had depression, anxiety and panic attacks, but reported that she was "overall better."  (Tr. 184).

12

However, she continued to be seen for anxiety/panic disorder on September 19, 2007, June 11, 2008, and December 22, 2008.  (Tr. 174, 175-76, 179-80).

On February 21, 2009, claimant's nurse practitioner indicated that claimant's anxiety was accompanied by autonomic hyperactivity, apprehensive expectation, and recurrent severe panic attacks on average of once a week.  (Tr. 149, 154).  She stated that emotional factors contributed to the severity of claimant's symptoms and functional limitations.  (Tr. 147).  She further found that claimant's symptoms were severe enough to frequently interfere with attention and concentration.

Additionally, Ms. Neely noted that claimant was treated with Metoprolol to decrease tachycardia from panic attacks, and Buspar and Diazepam as anti-anxiolytics.  (Tr. 149).  She opined that as a result of her impairment, claimant was likely to be absent from work more than four days per month.  Based on this evidence, the undersigned finds that the record should be more fully developed as to her mental condition, specifically the panic attacks and the effect that the panic attacks and the medication prescribed to treat them have on her ability to obtain and maintain employment.

Regarding claimant's complaints of polyneuropathy, the ALJ noted that the consultative examiner indicated possible diabetic neuropathy, but there was a

"paucity" of treatment records for diabetes.  (Tr. 18).  This finding by the ALJ is

not supported.  The record reflects that she was *regularly* seen for this condition

after her diagnosis.  (Tr. 175-76, 177-78, 179-80, 181-82, 183-84).  Furthermore,

once this diagnosis was made, it appeared that claimant's neuropathy worsened.

On June 15, 2007, claimant's lower extremities were hyper-reflexic, her gait

was ataxic, and she had weakness and diminished sensation.  (Tr. 183).  It was

noted on August 15, 2007, that she had "squeezing/burning pain" in the lower

extremities and "loss of protective sensation to feet."  (Tr. 181).  On June 11,

2008, claimant reported having frequent falls.  (Tr. 175).

On December 22, 2008, claimant's diagnosis was severe diabetic

neuropathy bilaterally.  (Tr. 173-74).  She had abnormal reflexes in the patella and

Achilles, had no sensation to light touch on either foot, and reported falling

multiple times at home.  She was beginning to have an ataxic-appearing gait, and

diminished sensation to the entire lower part of both legs.  (Tr. 174).

On February 4, 2009, claimant reported that she had fallen three time since

her last visit.  (Tr. 172).  Her gait appeared to be worse than on previous visits.

She had a very ataxic gait, and had no sensation to the bilateral lower extremities.

Ms. Neely noted that "safety issues will soon require assistive device."  She

opined that claimant's impairments lasted or could be expected to last at least 12

14

months.  (Tr. 144, 147).  Thus, the ALJ's statement that there was a "paucity" of treatment records for diabetes and neuropathy is plainly erroneous and refuted by the clear record.

Additionally, the ALJ found that while an MRI of the lumbar spine revealed a herniated disc with mild spinal stenosis at L4-5, claimant had had no reported back pain.  (Tr. 18).  Again, this statement is not supported by the clear evidence.

The records from Fleur de Lis Community Health indicate that claimant complained of leg and *back* pain on March 14, 2006.  (emphasis added).  (Tr. 193-94).  At the visit on April 27, 2006, claimant had decreased sensation to the lower extremities, decreased leg strength, and severe neuropathy bilaterally, for which she was prescribed Panlor SS, a medication used to treat moderate to severe pain.  (Tr. 187-88).  On September 19, 2007, she again complained of *back* and leg pain.  (emphasis added).   (Tr. 179).  Also, on December 22, 2008, she reported that she was still having moderate *low-back* pain.  (Tr. 174).  Thus, the ALJ's statement that claimant had reported no back pain is plainly wrong.

Claimant argues that the ALJ erred in failing to give proper weight to the opinions of her treating sources.  The undersigned agrees.  It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in

15

determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with . . . other substantial evidence*."  (emphasis added).  *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

In this case, claimant's most recent medical records were from Angela Neely, FNP at Fleur de Lis Community Health.  Nurse practitioners are not "acceptable medical sources," and "only 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."  *Ragan v. Astrue*, 2012 WL 4589737, at *8 (S.D. Miss. Aug. 16, 2012) (*citing* 20 C.F.R. §§ 404.1513, 416.913 (2011)) (listing acceptable medical sources as licensed physicians,

psychologists, podiatrists, and speech-language pathologists); SSR 06–03P, 2006

WL 2329939, at *2 (S.S.A. Aug. 9, 2006) (stating that only "acceptable medical

sources" can be considered treating sources whose medical opinions may be

entitled to controlling weight as set forth in 20 CFR § 404.1527(c) and § 416.927

(c)).

      However, even though a nurse practitioner is not considered an "acceptable"

medical source under the regulations and, therefore, cannot establish the existence

of a medically determinable impairment, the Commissioner still may use evidence

from these sources to assess the severity of an impairment and how it affects the

claimant's ability to work.  *Jones v. Astrue*, 2012 WL 3660711, at *3 n. 3 (W.D.

La. June 27, 2012) (Hayes,MJ.) (*citing* SSR 06–03p; 20 C.F.R. § 404 .1513(d) &

416.913(d)).  Moreover, the ALJ is *required* to consider evidence from "other

sources" when evaluating an "acceptable medical source's" opinion.  *Id*. (*citing*

SSR 06–03p).

      The undersigned finds that the Commissioner should have considered the

records from the nurse practitioner in assessing the severity of claimant's

impairments and how they affected her ability to work.  In her Request for

Review, claimant submitted records from Fleur de Lis Community Health dated

March 14, 2006 through February 21, 2009.  (Tr. 4).  The Appeals Council denied

the request, finding that the information did not provide a basis for changing the ALJ's decision.  (Tr. 2).  The undersigned disagrees.

Under some circumstances, a consultative examination is required to develop a full and fair record.  *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987).  The decision to require such an examination is discretionary.  *Id*.  In *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977), the Fifth Circuit stated  "[t]o be very clear, 'full inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision."  A claimant must "raise a suspicion concerning such an impairment necessary to require the ALJ to order a consultative examination to discharge his duty of 'full inquiry' under 20 C.F.R. § 416.1444."  *Pearson v. Bowen*, 866 F.2d 809, 812 (5th Cir. 1989) (*quoting Jones*, 829 F.2d at 526).

In this case, the consultative examination by Dr. Briley was performed on August 8, 2007.  (Tr. 128-31).  At that time, he opined that claimant had possible diabetic neuropathy.  (Tr. 129).  However, claimant was not definitively diagnosed until after that date.

The record reflects that the ALJ was at least aware of the potential severity of claimant's mental problems and diabetic neuropathy.  However, it was not

18

claimant's duty, particularly where she was unrepresented,[2] to further develop the record in light of this suspected mental impairment.  Instead, once the claimant raised the suspicion of her mental impairment, it was the *ALJ's duty* to fully and fairly develop the record.  *Pearson*, 866 F.2d at 812.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to obtain a consultative examination and residual functional capacity assessment regarding claimant's panic disorder and diabetic neuropathy during the relevant time period. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See, *Richard v. Sullivan*, 955 F.2d 354 (5ᵗʰ Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292

---

[2]The ALJ has a heightened duty in cases where a claimant is unrepresented by counsel "to develop the facts fully and fairly and to probe conscientiously for all of the relevant information." *Gullett v. Chater* 973 F.Supp. 614, 622 (E.D.Tex.1997) (*quoting Ware v. Schweiker,* 651 F.2d 408, 414 (5th Cir.1981), *cert. denied,* 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982)).

(1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED*

***SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed January 7, 2013, Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  1-7-2013
By:  MBD

21